UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DEVORIS JAMES, et al.,

    Plaintiffs,

    v.                                                    Case No. 3:22-CV-723-CCB

INDIANA DEPARTMENT OF
CORRECTION, et al.,

    Defendants.

## OPINION AND ORDER

Plaintiffs Devoris James, Danny Horton, Anthony Gipson, Kable Daniels,

Theodis Thomas, Jonathan Thomas, Jason Cooper, Raul Ramirez, Clinton Jacobs, Joshua

Durr, and Kwame Riddle sued Defendants Indiana Department of Correction, Sergeant

Megan Hensley, Sergeant Kristin Woods, Captain George Payne, Jr., Officer Royal,

Sergeant Larry McDonald, Lieutenant Jerry Thompson, and Michelle Pickens[1] under 42

U.S.C. § 1983, alleging that Defendants violated their Eighth Amendment rights by

subjecting them to cruel and unusual punishment through the conditions of their

confinement. Defendants have moved for summary judgment.[2]

---

[1] Michelle Pickens is sued as the personal Representative of Captain Ernest Pickens, whose actions are implicated in this case. (ECF 1).
[2] All Defendants have moved for summary judgment with the exception of Defendant Jerry Thompson and Defendant Officer Royal. (ECF 143 at 1).

### BACKGROUND

The following facts are undisputed unless noted otherwise. To dispute a fact, the party opposing summary judgment must identify the fact as disputed and cite to evidence that raises a genuine dispute. N.D. Ind. L. R. 56-1(b)(2)(C); Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Thus, a fact is undisputed if the party either noted it as such, or cited no evidence that raised a genuine dispute. During all times relevant to this case, Plaintiffs were incarcerated at the Indiana Department of Correction's Miami Correctional Facility ("MCF") in Bunker Hill, IN. (ECF 145 ¶ 1). All Defendants were employed by the Indiana Department of Correction at MCF. (*Id.* ¶ 2).

The events giving rise to this case occurred on September 9 and 10, 2020, amid the COVID-19 pandemic. (*Id.* ¶¶ 1, 4). At that time, healthcare at MCF was provided by Wexford Health Sources, Inc. ("Wexford") (*Id.* ¶ 5). At the beginning of the pandemic, Wexford was authorized to oversee the policies and procedures for quarantining individuals incarcerated at MCF. 8. Wexford maintained a database that tracked the COVID-19 status of all MCF inmates, and Wexford directed COVID-19-related transfers within the prison. (*Id.* ¶ 9). On September 9, 2020 at 2:51 p.m., a medical director at Wexford sent MCF's Warden Hyatte and other prison officials an email with a list of incarcerated individuals who had been exposed to COVID-19 but tested negative ("group"). (*Id.* ¶ 10). The email directed prison officials to move those individuals from the "K-Dorm" ("dorm") to the "Phase 1 gym" ("gym"). (*Id.* ¶ 12). All Plaintiffs were listed in this email. (*Id.* ¶ 11).

Warden Hyatte left his shift at 3:30 p.m. and passed the message on to Defendant Captain Ernest Pickens to "facilitate the move" of the individuals from the dorm to the gym. Defendants Captain Pickens, Sergeant Hensley, Sergeant Woods, and Lieutenant Thompson were assigned to the night shift that evening. (*Id.* ¶ 16). Those defendants arrived before the night shift began at 6:00 p.m. (*Id.* ¶¶ 17–19). 17-19.[3] At that time, Captain Pickens instructed Hensley and Woods to move the listed individuals from the dorm to the gym. (*Id.* ¶ 20).

While Hensley and Woods were moving the listed individuals into the gym, someone inside the gym yelled that they had COVID-19. (*Id.* ¶ 23). The person was not identified, nor is there any evidence that anyone in the gym had COVID-19. Still, after hearing this, a group of individuals, including all Plaintiffs, refused to enter the gym. (*Id.* ¶ 24). After the refusal, Hensley and Woods contacted Lieutenant Thompson, who contacted Captain Pickens. (*Id.* ¶ 25).

Captain Pickens decided to hold the group in the recreation yard. He states that this was a temporary measure while he determined a solution to the group's refusal. (*Id.* ¶ 26). Captain Pickens then went out into the yard to speak personally with the group and convince them to move into the gym voluntarily. (*Id.* ¶¶ 25–28, 37). This did not succeed (*Id.*). After this, Captain Pickens decided not to move Plaintiffs out of the yard. (*Id.* ¶ 31). It is undisputed that there were more incarcerated individuals within the yard

---

[3] Plaintiffs state that they also saw Defendants Payne and McDonald that night. (ECF 153 at 11). Defendants contest this. Thus, on summary judgment, the Court will assume that Payne and McDonald were at least partially involved in the alleged activities. *See Anderson*, 477 U.S. at 249.

than there were staff members at the prison that night. (*Id.* ¶ 30).[4] Captain Pickens was also unable to determine whether anyone in the gym had COVID-19. (*Id.* ¶ 30). Captain Pickens states that his decision to keep the group in the yard was based on his concern for order and safety given the ratio of inmates to guards. (*Id.* ¶¶ 30–31).[5]

Plaintiffs spent the night in the yard, and were transferred into the gym in the morning, during the next shift. (*Id.* ¶ 38). Plaintiffs' claim that Defendants' choice to move them into the gym and hold them in the yard violated their Eighth Amendment rights, arguing that this exposed them to the risk of COVID-19 as well as cold, rain, and other conditions while they were kept in the yard overnight. (ECF 1).

## STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

To determine whether a genuine dispute of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving

---

[4] At the time of these events, the day shift ran from 6:00 a.m. to 6:00 p.m. and consisted of fifty-five staff members. (*Id.* ¶ 17). The night shift ran for the remainder of time and consisted of thirty-five staff members. (*Id.*).

[5] Captain Pickens also states that when he went into the yard, several inmates exhibited aggressive behavior towards him. (*Id.* ¶ 29). But this is disputed, and is thus not considered in this Court's order on summary judgment. (ECF 153 ¶ 29).

party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). The court must not "sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). The court does not have to conduct research or develop arguments for parties either. *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011); *see also United States v. Beavers*, 756 F.3d 1044, 1059 (7th Cir. 2014) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived.").

"To defeat a motion for summary judgment, the non-moving party cannot rest on the mere allegations or denials contained in his pleadings, but must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (internal quotations omitted), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). "Summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted); *see also Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

### ANALYSIS

Plaintiffs argue that Defendants violated their Eighth Amendment rights against cruel and unusual punishment by (1) moving them to a building where they were likely

to experience increased risk of contracting COVID-19 and (2) holding them in an outdoor yard throughout the night.

To make an Eighth Amendment claim regarding the conditions of penal confinement, a plaintiff must show two things: (1) that he suffered an "extreme deprivation" with regards to the conditions of his confinement (sometimes referred to as the "objective prong") and (2) that the defendants acted with "deliberate indifference" to the conditions of his confinement (sometimes referred to as the "subjective prong"). *See Delaney v. DeTella*, 256 F.3d 679, 683 (7th Cir. 2001) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)).

## I. Objective Prong: Extreme Deprivation

A plaintiff's conditions of confinement must constitute "extreme deprivations" to be actionable. *Hudson*, 503 U.S. at 9. In order to be "sufficiently serious" to constitute a cognizable deprivation under the Eighth Amendment, a prison official's omission or act "must result in the denial of the minimal civilized measure of life's necessities." *DeTella*, 95 F.3d at 590 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). When evaluating whether a denial met this threshold, courts look to the totality of conditions of confinement. *See Johnson v. Pelker,* 891 F.2d 136, 138–139 (7th Cir. 1989). In particular, courts evaluate the type, intensity, and duration of any deprivations. *See Reed v. McBride*, 178 F.3d 849, 853 (7th Cir. 1999).

Here, it is undisputed that Plaintiffs were housed outdoors overnight without any shelter. (ECF 157 at 3). Plaintiffs' argument primarily relies on their alleged

6

subjection to cold temperatures and rain during the night. (ECF 152 at 12). Plaintiffs argue that these conditions were further exacerbated by the lack of restrooms and water. (*Id.*).[6] It is also undisputed that Plaintiffs were moved into the gym with other individuals who had been exposed to but tested negative for COVID-19.  (ECF 153 ¶ 10).

### A.  Type and Intensity

Plaintiffs' argument heavily relies on two cases in which the Seventh Circuit held that exposure to cold temperatures could constitute cruel and unusual punishment. In *Dixon v. Godinez*, the Seventh Circuit ruled that the temperatures in a cell could constitute cruel and unusual punishment when it was undisputed that the inmate's cell temperature averaged "about 40 degrees" and fell below freezing. 114 F.3d 640, 643 (7th Cir. 1997). In *Bentz v. Hardy*, the court reversed a grant of summary judgment when the inmate was subjected to temperatures below 50 degrees. 638 F. App'x 535, 537 (7th Cir. 2016).

Here, according to the undisputed historical temperature data for the night,[7] the temperature ranged from 78 degrees at the time the group entered the yard to a nightly low of sixty-six degrees. (ECF 153 ¶ 32; 158 at 3 n.3). Thus, the temperatures were much higher than those in *Dixon* or *Bentz*. Still, Plaintiffs argue that this case is sufficient to

---

[6] It is undisputed that Plaintiffs did not access restrooms while they were held in the yard. (157 ¶ 7). It is also undisputed that they were given permission to urinate in the yard if necessary. *Id.* There is no evidence that Plaintiffs requested the use of restroom facilities and were denied them. The parties contest whether or not Plaintiffs were provided with water during the night. (ECF 157 ¶ 9).

[7] Plaintiffs have made no objections to the admissibility of the historical temperature records in evidence, and it is thus proper for the Court to consider them on summary judgment. *See Ennin v. CNH Indus. Am., LLC,* 878 F.3d 590, 596 (7th Cir. 2017).

pass summary judgment due to other mitigating factors, primarily their allegations that they were denied access to restrooms and were not provided with water or shelter from the alleged rain. (ECF 153 ¶ 7, 12).[8]

But there were other mitigating factors also present in *Dixon* and *Bentz*—most of which appear more extreme than the case here. For example, in *Dixon*, the cell was so cold that ice would consistently form on the walls of the cell block during the day and night. *Dixon*, 114 F.3d at 642. In *Bentz*, the plaintiff alleged that his cell was open to rain and often full of pools of water, that it was infested with cockroaches and earwigs, and that he received an electrical shock when he used the light switch. *Bentz*, 638 F. App'x at 536. Thus, under a totality of the circumstances, it is hard to say that the type and intensity of Plaintiffs 'deprivations reach the levels the Seventh Circuit has held are appropriate to pass summary judgment. *See Johnson* 891 F.2d at 138–39; *Reed*, 178 F.3d at 853. And that is even without addressing the final component of the analysis—duration.

### B. Duration

In evaluating conditions of confinement claims, the Supreme Court has made it clear that time or duration is a critical variable in deciding whether a deprivation was an unconstitutional denial of necessities. *See Hutto v. Finney*, 437 U.S. 678, 686, (1978) (holding that "the length of confinement cannot be ignored in deciding whether the

---

[8] Plaintiffs also assert that the weather can be described as "cold" because the presence of water can cause hypothermia at temperatures "above 40 degrees." (ECF 151 at 16). But that is irrelevant to the inquiry here, where the temperature never fell below sixty-six degrees. (ECF 153 ¶ 32; 158 at 3 n.3). Moreover, cold is part of the "objective" inquiry of conditions of confinement claims. *See Reed*, 178 F.3d at 853. Even if Plaintiffs felt "cold," the undisputed data shows that the temperatures were orders of magnitude higher than any cases that Plaintiffs rely on, and Plaintiffs provide no evidence that those temperatures would have posed a "substantial risk of serious harm," even with the presence of water or moisture. *Anderson v. Morrison*, 835 F.3d 681, 682 (7th Cir. 2016).

confinement meets constitutional standards," and distinguishing between conditions that might be "tolerable for a few days" but "intolerably cruel for weeks or months.").

The Seventh Circuit has distinguished between the "temporary inconvenience" of being forced to sleep in wet and cold without dry bedding or clothing for two and a half days, and more extended cases. *Johnson* 891 F.2d at 138 (contrasting a "temporary inconvenience" with other situations in which plaintiff was (1) placed in a cell for three days with no access to water and feces on the wall; (2) placed in total sensory deprivation for five days, or (3) placed in a solitary confinement "strip cell" without clothing, proper heating, or sanitary supplies in subfreezing temperatures for thirty-three days) (citing *LaReau v. MacDougall*, 473 F.2d 974, 976–78 (2d Cir. 1972); *Wright v. McMann*, 387 F.2d 519, 526 (2d Cir. 1967))). *See also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996) (dismissing an allegation of inadequate bedding as "at most a temporary situation of a night's duration") (citing *Johnson*, 891 F.2d at 138)).

The Seventh Circuit cases that Plaintiffs rely on were equally emphatic about the importance of duration. Both *Dixon* and *Bentz* made very clear that, when calculating whether subjection to lower temperatures or inadequate housing constituted cruel and unusual punishment, the duration of time was a key factor in determining whether a plaintiff's claims could survive summary judgment. *Dixon*, 114 F.3d at 643 ("The conditions which [Plaintiff] had to endure were clearly not as severe as those in [other cases]. Unlike those cases, however, the cold of which [plaintiff] complains persisted for months, winter after winter"); *Bentz*, 638 F. App'x at 537 ("Exposure to cold

9

temperatures over an extended period can constitute cruel and unusual treatment")
(citing *Dixon*, 114 F.3d at 643–45)).

The plaintiffs in *Dixon* and *Bentz* experienced the alleged unconstitutional
conditions of confinement for long periods of time. In *Dixon*, the plaintiff's conditions
lasted for three years. 114 F.3d at 641. In *Bentz*, the plaintiff was kept in his cell for six
months. 638 F. App'x at 538.

Here, Plaintiffs were in the yard for about 9 hours. (ECF 144 at 12). And that is
only the total time they were in the yard—not the total time during which the alleged
deprivations occurred. For example, it is undisputed that it was not raining when
Plaintiffs were initially placed in the yard, and that the lowest temperature was sixty-six
degrees. (ECF 153 ¶ 32). Thus, even on Plaintiffs' own argument, conditions only would
have been unconstitutionally harsh for some indeterminate subset of that nine hours.
Indeed, Plaintiffs only argue in briefing that they were held unconstitutionally for
"several hours." (ECF 152 at 15). Given the nature of the alleged deprivations, this is an
insufficient duration of time to constitute an unconstitutional deprivation. *See Antonelli*,
81 F.3d at 1430; *Dixon*, 114 F.3d at 641. *See also Johnson*, 891 F.2d at 139 (holding that a
temporary deprivation of dry or warm sleeping quarters as long as two days did not
"approach unconstitutional proportions.").

There is disagreement about some specific aspects of the confinement here, such
as whether it rained while the inmates were outside, and also whether the group was
provided with water. (ECF 152 at 4; 158 at 7). Still, even viewing these factual disputes
in the light most favorable to Plaintiffs, the deprivations which they suffered were less

severe and far less extended than any of the cases that they cite to. First, as discussed above, one of the key components of Plaintiffs' deprivation claim—extreme cold—is not supported by any evidence that temperatures were anywhere near the low levels that the Seventh Circuit has held may constitute a constitutional deprivation. *See Dixon*, 114 F.3d at 643. Second, even if the type and intensity of the deprivations were comparable to the levels that the Seventh Circuit has held sufficient to pass summary judgment, the duration of Plaintiffs alleged deprivations—some number of hours—does not approach the days, months, and yearslong deprivations at which the Seventh Circuit has allowed conditions of confinement claims to pass summary judgment. *See id.*; *Bentz*, 638 F. App'x at 537; *Hutto*, 437 U.S. at 685 at 685; *Johnson*, 891 F.2d at 138.

Nor is there any caselaw supporting the proposition that one night without water or restrooms reaches the level of cruel and unusual punishment—quite the opposite, in fact.[9] The threshold where conditions of confinement cease to be a "temporary inconvenience" and become unconstitutional may not always be clear, but Plaintiffs have not shown that this case could meet that threshold.

---

[9] *See Harris v. Jones*, No. 20-1625, 2021 WL 4950248, at *2 (7th Cir. Oct. 25, 2021) ("[t]emporary lack of toilet access is not cruel and unusual punishment"); *Thomas v. McCoy*, No. 17 C 6386, 2020 WL 247464, at *6 (N.D. Ill. Jan. 16, 2020) ("The court acknowledges that the lack of access to toilet facilities for a short period of time may not be sufficiently serious to state a claim of constitutional dimension, particularly if access is denied due to valid penological concerns."); *Perry v. JPAY, Inc.*, No. 7:16-CV-00362, 2018 WL 1309743, at *8 (W.D. Va. Mar. 13, 2018) ("Temporary restrictions on bathroom use, even ones lasting hours, do not constitute the wanton infliction of pain or exhibit deliberate indifference to a prisoner's health or safety.") (quoting *Watson v. Graves*, No. 1:15cv1214, 2017 WL 4533103, at *5 (E.D. Va. Oct. 6, 2017)); *Freeman v. Sheahan*, No. 94 C 1776, 1996 WL 18883, at *7 (N.D. Ill. Jan. 17, 1996) ("[m]issing food for 13 hours does not constitute cruel and unusual punishment"); *Spraggs v. Smith*, No. 93 C 2890, 1994 WL 66111, at *4 (N.D. Ill. Mar. 2, 1994) ("Even assuming that [defendant] intentionally failed to provide drinking water to [plaintiff] in his cell for several days, this particular deprivation does not implicate the objective "standards of decency" discussed in the case law").

11

Plaintiffs also argue that the decision to move them to the gym constituted cruel and unusual punishment by exposing them to the risks of COVID-19. But Plaintiffs do not cite a single case in which a court held that exposure to COVID-19 could rise to the level of cruel and unusual punishment. Indeed, if this was true, it might be said that a majority of Americans have experienced the equivalent of cruel and unusual punishment.[10] And in any case, as is discussed below, an Eighth Amendment claim is foreclosed as a matter of law because it is undisputed that Defendants did not personally make the decision to move Plaintiffs to the gym, but were relying in good faith on guidance and direction from medical authorities. *See infra* p. 14.

Finally, Plaintiffs allege that Defendants Woods and Hensley, along with other prison officials, used the threat of "dogs, mace, tasers, and pepper ball guns" to force them into the gym on the morning of September 10. (ECF 153 at 10). But the threat of force is a legitimate tool to ensure prison order and safety when done in good faith. *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986); *Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984). Here, that threat of force was used to implement a health policy provided by other parties and designed to minimize the health risks to inmates. (ECF 145 ¶¶ 4–12). Thus, any cruel and unusual claim based on the movement of Plaintiffs into the gym easily fails on the objective prong. *See Johnson* 891 F.2d at 138–39.

## II. Subjective Prong: Deliberate Indifference

---

[10] Clarke KE, Jones JM, Deng Y, et al. *Seroprevalence of Infection-Induced SARS-CoV-2 Antibodies — United States, September 2021–February 2022*, Morbidity & Mortality Wkly. Rep. 606–-08 (2022), http://dx.doi.org/10.15585/mmwr.mm7117e3 (noting overall adult rate of prior COVID-19 infection at 57.7 percent during December 2021–February 2022).

To succeed on a cruel and unusual punishment claim, a plaintiff must also show that the defendants had a "sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). In conditions of confinement cases, the necessary standard is subjective criminal recklessness, which is "deliberate indifference" to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). To show deliberate indifference, a plaintiff must show that the defendant knew of a substantial risk to the inmate and acted in disregard of that risk. *See Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).

To determine whether defendants "disregarded" a risk, courts look to whether the defendants "responded reasonably" to the risk, *Scott v. Moss*, No. 24-1479, 2025 WL 48412, at *3 (7th Cir. Jan. 8, 2025), and if they had any "feasible alternatives" in acting, *Townsend v. Cooper*, 759 F.3d 678, 690 (7th Cir. 2014). A finding of good-faith error also forecloses an inference of deliberate indifference. *See Whitley*, 475 U.S. at 319 ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause"); *Carlisle v. Fofana*, No. 18-C-1924, 2019 WL 188449, at *3 (E.D. Wis. Jan. 14, 2019) (citing *Est. of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996)).

Plaintiffs argue that deliberate indifference can be inferred from the fact that Defendants (1) transferred Plaintiffs to the gym along with other individuals who may have had COVID-19 and (2) subsequently place them outside in the prison yard.

Both the Seventh Circuit and the Supreme Court have emphasized that prison officials are given wide discretion in their decision-making regarding safety and order

in the prison complex, especially when there is evidence that they were acting in good faith. *See Whitley*, 475 U.S. at 321–22 ("Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security" (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)); *Fields v. Smith*, 653 F.3d 550, 557 (7th Cir. 2011). This principle of deference is equally true when evaluating prison officials' response to the risk of COVID-19. *See Mays v. Dart*, 974 F.3d 810, 820 (7th Cir. 2020); *Coates v. Mahoney*, No. 20-CV-600-WMC, 2021 WL 1854278, at *2 (W.D. Wis. May 10, 2021).

Here, there is no evidence that Defendants were not acting in good faith — in fact, there is much evidence to the contrary. Defendants' movement of Plaintiffs to the gym is particularly unproblematic from an Eighth Amendment perspective, because it was done under the direction of medical consultants. (ECF 153 ¶¶ 5–13). The Seventh Circuit has made clear that when jail officials "reasonably relied on the judgment of medical personnel," they did not act with deliberate indifference. *Miranda v. Cnty. of Lake*, 900 F.3d 335, 343 (7th Cir. 2018). Thus, that activity cannot violate the Eighth Amendment.

The choice to move Plaintiffs to the yard is more complicated, but there is no way to infer bad faith conduct by Defendants. It is undisputed that the decision was not premeditated and was done only in direct response to Plaintiffs' unanticipated refusal to enter the gym. (ECF 153 at 5–6). Plaintiffs argue that a jury could infer that this was done as a punishment. (ECF 152 at 24). But they cite no evidence which calls into question Captain Pickens' statement that he only moved the group to the yard as a

14

temporary measure to negotiate with them, and that he planned to move them into the gym once they "calmed down." (ECF 153 ¶ 26; 143-4 at 69–70).

It is undisputed that, when Captain Pickens spoke with Plaintiffs in the yard, he repeatedly gave them the choice to move into the gym, and that Plaintiffs could have moved into the gym at any point during the night. (ECF 153 ¶ 37). Thus, at all times, Plaintiffs were only in the outdoor yard due to their continued refusal to enter the gym. (*Id.*). Plaintiffs were not handcuffed at any time, and were allowed to bring all their belongings into the yard with them. (ECF 145 ¶¶ 33–34). This evidence completely precludes Plaintiffs' claim that keeping them in the prison yard was a "punishment" for their initial refusal to enter the gym.

Plaintiffs do not cite evidence suggesting that Captain Pickens declined to take other reasonable courses of action after Plaintiffs refused to enter the gym. And Plaintiffs cite no evidence calling into question Captain Pickens's statement that he decided to keep them in the yard overnight as a precaution due to concerns about the number of inmates in the yard relative to his staff. (ECF 153 ¶ 30–31). It is undisputed that there were more incarcerated individuals in the yard then prison staff members at that time. (ECF 145 ¶ 30). In fact, the testimony of Plaintiffs' own expert supports the contention that the, given the fact of the stalled prison transfer and prison staffing shortages, Captain Pickens's choice at that point was reasonable. (ECF 152-14 at 38).

Plaintiffs' expert witness Mr. Lenard Vare testifies that the decision to move the group into block 1 was inconsistent with best practices to mitigate the risk of COVID-19

15

infection.[11] But, as discussed above, Defendants' reliance on the direction of third-party medical consultants forecloses a finding of "deliberate indifference" in this case. (ECF 145 ¶¶ 10–12). *Miranda*, 900 F.3d at 343. *See also Johnson v. Snyder*, 444 F.3d 579, 585 (7th Cir. 2006), *overruled on other grounds*, *Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013)(emphasizing that the standard for administrative decision-making in cases involving COVID-19 is not "best practices," or even gross negligence, but the same as in other conditions of confinement cases—whether they were deliberately indifferent.).

Mr. Vare also testifies that it was unwise for Defendants to initiate the transfer of the group to the gym in the evening with foreknowledge that prison staffing was reduced at that time. (ECF 152-14 at 38).[12] But this doesn't get Plaintiffs anywhere close to showing deliberate indifference sufficient to rise to the level of cruel and unusual punishment. Even if Mr. Vare is right that the decision to engage in an evening transfer was unwise, that is emphatically not the standard for cruel and unusual punishment. *See Bostic v. Murray*, 160 F.4th 831, 843 (7th Cir. 2025) ("[defendants'] actions may have

---

[11] Defendants argue that the entirety of Mr. Vare's report and supplemental report are inadmissible because they were not notarized or sworn before an officer authorized to administer an oath. (ECF 158 at 11). But as noted by the Seventh Circuit, non-notarized documents may still be admissible under 28 U.S.C. § 1746 if the witness made a signed statement under penalty of perjury. *Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985). Mr. Vare did provide such a statement, and thus his report is not inadmissible on that basis. (ECF 152.16 at 2).

[12] Mr. Vare also attempts to testify on Captain Pickens' state of mind. Although this is a civil case and Federal Rule of Evidence 704(b) does not apply, there are manifold problems with this. First, even if Mr. Vare has shown his expertise in prison administration, he has not shown any expertise which would render him particularly reliable in diagnosing what Captain Pickens did or did not think. *See Hammock v. Mentor Worldwide, LLC*, No. 19-CV-1041- RJD, 2021 WL 12318781, at *4 (S.D. Ill. Mar. 29, 2021). Thus, Mr. Vare's testimony on this matter is likely inadmissible under Rule 702. Furthermore, inferring the mental state of a defendant is the normally the unique province of the jury—not experts. *See McCormick v. United States*, 500 U.S. 257, 270 (1991) ("It goes without saying that matters of intent are for the jury to consider"); *Lorillard Tobacco Co., Inc. v. A & E Oil, Inc.*, 503 F.3d 588, 594 (7th Cir. 2007), *overruled on other grounds*, *McCarter v. Ret. Plan For Dist. Managers of Am. Fam. Ins. Grp.*, 540 F.3d 649, 654 (7th Cir. 2008).

been unwise, but they did not behave in a way that allows for the inference that they acted with deliberate indifference."). And in any case, this focuses on the wrong aspect of Plaintiffs' claims. Plaintiffs do not claim that the decision to move them *in the evening* violated the Eighth Amendment. Rather, they allege that the decision to keep them in the yard overnight did so. Showing that the initial decision to transfer Plaintiffs to the gym during the night was unwise does not get anywhere close to showing that, once faced with a yard full of noncompliant inmates and a decreased staff, Captain Pickens was deliberately indifferent. In fact, as noted above, Mr. Vare's own analysis and the record confirm that Captain Pickens's decision did not exceed the deference given to prison officials in making decisions regarding prison order and safety. *See Fields v. Smith*, 653 F.3d 550 at 557; *Whitley*, 475 U.S. at 321–22; *Mays*, 974 F.3d at 820.

Plaintiffs cannot show that Defendants could meet the subjective "deliberate indifference" prong of the Eighth Amendment conditions of confinement test because they do not show any evidence that Defendants did not act in good faith or that they exceeded the deference given to prison officials in making decisions that ensure the safety and security of a prison complex. Thus, Plaintiffs' fail to raise a genuine issue of material fact on either the subjective or objective prongs of the Eighth Amendment conditions of confinement analysis, and are entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED** as to Defendants Indiana Department of Correction, Michelle Pickens,

17

Megan Hensley, Kristin Woods, George Payne, Jr., and Larry McDonald. (ECF 143).

Officer Royal and Jerry Thompson remain defendants in this case.

SO ORDERED on March 24, 2026.

/s/ *Cristal C. Brisco*
CRISTAL C. BRISCO, JUDGE
UNITED STATES DISTRICT COURT